UNITED STATES DISTRCT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 13-cv-24406

THE BUGARIE GROUP LLC, a
Florida Limited Liability Company,

    Plaintiff,

vs.

STARDUST PICTURES, LLC, a
California Limited Liability Company.

    Defendant.
_____/

## VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, THE BUGARIE GROUP LLC ("BUGARIE"), by and through its undersigned counsel does hereby sue STARDUST PICTURES, LLC ("STARDUST") and in support thereof states as follows:

### OVERVIEW

This is a complaint for Breach of Contract based on Defendant's failure to perform its clear and unambiguous obligations to produce, complete, deliver and market a reality TV show under the terms of a Producer Agreement. Defendant was paid in excess of $100,000 to produce that reality show. The so called program that Defendant delivered to Plaintiff, contained either no sound, muffled or unusable sound, among other problems, hence it is unusable as contemplated by the agreements between the parties, resulting in a total loss to the Plaintiff.

### JURISDICTION AND VENUE

1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and

costs, and is between two limited liability companies of different States. The Court has in personam jurisdiction over STARDUST, which conducts business in this district, because STARDUST has directed its wrongful actions and has caused damage to BUGARIE here, in the State of Florida. Finally, the Court has jurisdiction over this action pursuant to the Producer Agreement that forms the basis of this Complaint, which contains a "Governing Law" provision that requires the Producer Agreement to be governed and interpreted in accordance with the laws of the State of Florida.

2. Venue is proper in this district pursuant to 28 U.S.C. § 1391 in as much as a substantial part of the events or omissions giving rise to the claims for relief occurred in this judicial district and based upon the mandatory venue selection clause contained in the . Intellectual Property Licensing Agreement.

**PARTIES**

3. Plaintiff, BUGARIE, is and at all times mentioned herein was, a limited liability company organized and existing under the law of the State of Florida, having a principal place of business in Hollywood, Florida. At all times herein, Plaintiff, BUGARIE has been engaged in film production, marketing, creating special events and promotions. Specifically, BUGARIE is the entity behind the production of a reality TV show titled, "The Search for the Ultimate Miami Girl" (the "Reality Show").

4. Defendant, STARDUST, is and at all times mentioned herein was, a limited liability company organized and existing under the law of the State of California. Defendant, STARDUST is a production company of record for films including, *Natural Born Komics* (2007), *Shark City* (2009), *Child Wild* (2009), and *A Holiday Heist* (2011).

**FACTUAL BACKGROUND**

5. In 2012, BUGARIE had the idea to create a reality television show that would feature a variety of beautiful Miami, Florida-based women between the ages of 21-years-old and 35-years-old in a competition that would culminate with the selection of "The Ultimate Miami Girl."

6. On December 9, 2012, BUGARIE hosted an open casting call at a Miami, Florida venue called Stage 305, located within Magic City Casino.

7. The Reality Show was crafted to take place in three stages: (a) the open casting call; (b) contests to judge the contestants based on their style, personality and knowledge of Miami; and (c) a final round that crowned a winner and provided an award of $25,000.

8. The announcement of the Reality Show created a great amount of public attention and fanfare, by media entities and businesses interested in finding an opportunity to get involved with BUGARIE in which BUGARIE expected to generate anticipated profits.

9. One company that expressed immense interest in assisting with the creation, formation and execution of the Reality Show was STARDUST. Stardust represented to BUGARIE that it was capable, talented and that it had the necessary experience and know how to produce and market the Reality Show. BUGARIE reasonably relied upon the representations of STARDUST

10. After discussing the opportunity of being a part of the Reality Show at length, STARDUST and BUGARIE entered into an Intellectual Property Licensing Agreement, a true and correct copy of which is attached hereto as **Exhibit "A"** and referred to herein as the "Intellectual Property Licensing Agreement."

11. The Intellectual Property Licensing Agreement stipulated that STARDUST agreed to pay for the full license and use of all of the intellectual property for the Reality Show.

12. BUGARIE was interested in STARDUST based solely upon their representations of it's ability to produce the Reality Show in a first class "broadcast quality" manner.

13. BUGARIE trusted that STARDUST was willing and capable to produce a quality version of the Reality Show, that it would then be able to exploit and earn a profit from same.

14. BUGARIE relied on STARDUST's prior experience in connection with the production of films, along with STARDUST's representations that it was capable and willing to produce and market the Reality Show.

15. On January 25, 2013, BUGARIE and STARDUST entered into a Sales Representation and Producer Agreement, a true and correct copy of which is attached hereto as **Exhibit "B"** and referred to herein as the "Producer Agreement." The Producer Agreement and the Licensing Agreement" are collectively called the "Agreements"

16. The Producer Agreement obligated STARDUST to provide production services for the Reality Show and that the Reality Show would be recorded BY STARDUST on broadcast quality equipment in HD format using HD PANASONIC HPX or Sony XDCAM cameras or their equivalent.

17. HD PANASONIC HPX and Sony XDCAM cameras or their equivalent all have the capacity to record sound which is a basic and yet necessary component of a broadcast quality TV show.

18. The two "Agreements" contemplated that STARDUST would complete production of the Realty Show in a competent and professional manner, consistent with the "Broadcast Quality provisions of the Agreements.

19. The Reality Show had no value, unless the film produced by STARDUST was captured with accompanying and synchronized sound.

4

20. STARDUST delivered to BUGARIE a "finished" Reality Show in an unusable unprofessional, poor quality state and without sound.

21. STARDUST had actual and constructive knowledge that the film for the Reality Show was to contain sound and that it was obligated to produce the Reality Show at a level deemed to be broadcast quality

22. After STARDUST attempted to complete the Reality Show, BUGARIE discovered that STARDUST sent to Miami their least experienced personal and/or hired local untrained personal to work on the Reality Show.

23. In accordance with the Production Agreement, BUGARIE paid STARDUST a total of the agreed budget amount of $114,000 in exchange for film, that it could not use and was otherwise worthless.

24. A portion of the payment made by BUGARIE to STARDUST was for "Sound Design," "Sound – Final Mix" and a "Boom Operator" as set forth in the agreed upon budget.

25. To date, BUGARIE spent a total of $601,825.74 to develop the Reality Show. In addition, BUGARIE had its executives spend hundreds of uncompensated hours to work on the Reality Show with the expectation that it would earn a profit from the distribution of the Reality Show, sequels, spinoffs and based upon a further business relationship with the show's sponsors. At all times relevant, STARDUST was aware of the time and monies being incurred or spent by BUGARIE to produce the Reality Show.

26. BUGARIE suffered damages in the amount of $601,825.74 (to date), plus the value of the time that it spent on the Reality Show, plus lost profits which it reasonably expected to derive from the marketing and distribution of the Reality Show, including sequels or other

versions of the Reality Show, and BUGARIE suffered damages to the business relationships that it developed with the sponsors of the Reality Show which have been irreparably damaged as a direct and proximate result of STARDUST's breaches of the Agreements.

27. BUGARIE obviously entered into the Producer Agreement with STARDUST and paid STARDUST to create a meaningful product that BUGARIE could use and promote as the Reality Show. STARDUST breached its implied and expressed obligations under the terms of the Production Agreement.

28. In violation of its obligations under the terms of the Production Agreement, STARDUST delivered a product that was incapable of being used or marketed by BUGARIE, and the Reality Show was a failure because of STARDUST's breach of the Producer Agreement.

29. BUGARIE has fulfilled all of its obligations under the terms of the Agreements and it has satisfied all conditions precedent.

30. BUGARIE has retained the undersigned counsel and it has agreed to pay said lawyers a reasonable fee to enforce the Agreements.

## COUNT I – BREACH OF CONTRACT
### (Producer Agreement)

Plaintiff repeats and hereby incorporates by reference as though specifically pleaded herein, the allegations of paragraphs 1 through 30.

31. This is a count for breach of the Producer Agreement by STARDUST.

32. The parties executed the Producer Agreement on or about January 25, 2013. The fully executed contract was signed by Justin Levine (as Managing Member and on behalf of Defendant) and Taimark Walkine (on behalf of Plaintiff).

33. The Producer Agreement was made with respect to STARDUST's engagement to provide production services for the TV reality show tentatively entitled, "THE SEARCH FOR

THE ULTIMATE MIAMI GIRL."

34. As a result of Defendant's breach of the Producer Agreement, Plaintiff has been damaged.

35. The prevailing party in an action arising from the breach of the Producer Agreement is entitled to recover reasonable attorney's fees and costs.

**WHEREFORE**, for the reasons set forth herein, Plaintiff requests this Court to enter judgment, in an amount of $601,825.74, in its favor for damages incurred to date, together with such further damages that may accrue to Plaintiff as a proximate result of Defendant's breeches and against Defendant as a proximate result of Defendant's failure to fulfill its obligations under the Producer Agreement, and to award prejudgment interest, attorneys' fees and costs as is required by the Producer Agreement, and such further relief this Court deems to be just and fair.

### DEMAND FOR JURY TRIAL

Plaintiff demands a Jury Trial of all issues.

### VERIFICATION

**I Taimark Walkine do hereby verify, of matters within my personal knowledge, that the above allegations are true and correct.**

*[signature]*

**TAIMARK WALKINE**

Dated: December 6, 2013

Respectfully submitted,
**WOLFE LAW MIAMI, P.A.**
*Attorneys for Plaintiff*
175 SW 7th Street, Suite 2410
Miami, FL 33130
Phone: 305-384-7370
Fax: 305-384-7371

7

By: *s/Darren A. Heitner*
DARREN A. HEITNER
Florida Bar No.: 85956
dheitner@wolfelawmiami.com
RICHARD C. WOLFE
Florida Bar No.: 355607
rwolfe@wolfelawmiami.com